UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**Nationwide Affordable Housing Fund 27, LLC,** *et al.*,

    **Plaintiffs,**             :        **Case No. 2:20-cv-1762**

    v.                         **Judge Sarah D. Morrison**
                              :        **Magistrate Judge Kimberly A. Jolson**

**Urban 2004 Holding Company,**

    **Defendant.**

**OPINION AND ORDER**

This matter is before the Court on Defendant's Motion to Dismiss or, in the Alternative, to Transfer Venue. (ECF No. 6.) Plaintiffs filed a Response in Opposition to the Motion (ECF No. 7), and Defendant filed a Reply (ECF No. 9). Plaintiffs have also filed a Motion for Leave to File Sur-reply (ECF No. 19), which Defendant opposes (ECF No. 20). The Court does not consider Plaintiffs' proposed sur-reply to be necessary or helpful to deciding the relevant issues. The motion is **DENIED**. The Motion to Dismiss is now ripe for decision.

**I.  BACKGROUND**

This case arises from the operation of two partnerships (the "Partnerships") that control two housing developments (the "Properties") in Kentucky. (Compl. ¶¶ 19–21, ECF No. 1.) Plaintiff Nationwide Affordable Housing Fund 27, LLC, ("Nationwide") is the largest contributor of equity for the Partnerships. (*Id.* ¶¶ 22–24.) Defendant Urban 2004 Holding Company ("Urban") is a partner in each Partnership. (*Id.* Ex. 1 ("Ex. 1"), at 6, ECF No. 1-1; *id.* Ex. 2 ("Ex. 2"), at 6; ECF No. 1-2.) Plaintiff SCDC, LLC, ("SCDC") is the Special Limited Partner in each Partnership. (Ex. 1, at 6; Ex. 2, at 6.) The other relevant entity for purposes of

1

this motion is Wentwood Capital Advisors, LP, ("Wentwood"), which is the managing agent of Plaintiffs. (Pl. Opp. to Def. Mot. to Dismiss, at 5, ECF No. 7.)

The Partnerships are governed by lengthy partnership agreements (the "Agreements"), but only Section 6.5H—which is the same in both Agreements in all material respects—is relevant to the instant motion. Section 6.5H grants Urban the right to purchase a greater share in each Partnership during the nine-month period immediately following the "Compliance Period" at a price "established by a mutually agreeable appraisal." (Ex. 1, at 31; Ex. 2, at 31.) Section 6.5H further provides that if Urban does not exercise this right to purchase, then, "at any time after the expiration of the said nine (9) month period," SCDC may begin to market the Properties and get offers to purchase the Properties, and it may request that Urban offer the Properties for sale. (Ex. 1, at 31; Ex. 2, at 31–32.) In this circumstance, if SCDC requests that Urban offer the Properties for sale, Urban must oblige. (Ex. 1, at 31; Ex. 2, at 31.)

On December 17, 2019, Steven Greenbaum, an Urban representative, notified Tami Holtz, a Wentwood representative, that Urban had secured an appraisal of the Partnership interests and intended to exercise its Section 6.5H purchase options once the Compliance Period ended. (ECF No. 1-3.) Plaintiffs contend that Urban's appraisal was not a "mutually agreeable appraisal" as required by Section 6.5H and was otherwise flawed. (Compl. ¶¶ 36–40.) Plaintiffs further contend that Urban has refused to have a mutually agreeable appraisal performed. (*Id.* ¶ 42.)

On December 31, 2019, the Compliance Period ended, (*id.* ¶ 30), and the nine-month period in which Urban could exercise its right to purchase began. However, Plaintiffs contend that Urban's alleged "refusal to have a mutually agreeable appraisal performed constitutes an express repudiation, renunciation, and waiver" of its purchase rights. (*Id.* ¶ 43.) This left the

parties at an impasse whereby Urban sought to exercise its purchase rights, while Plaintiffs argued that Urban was no longer able to do so.

Over the next few months, the parties continued to negotiate how to move forward. (Def. Mot to Dismiss, at 8, ECF No. 6; ECF No. 7, at 4.) And at some point Plaintiffs secured appraisals of their own. (*See* ECF No. 7, at 5.) On March 25, 2020, Brian Brandstetter, a Wentwood representative, wrote a letter (the "March 25 Letter") to Mr. Greenbaum to request that the Properties be offered for sale. (ECF No. 1-5.) The letter requested "a detailed plan for the marketing and sale of the [P]roperties" within thirty days. (*Id.* at 2.) Plaintiffs contend that Urban has refused to offer the Properties for sale. (Compl. ¶ 47.)

On March 31, 2020, Mr. Greenbaum and Ms. Holtz spoke on the telephone. (ECF No. 7, at 4–5.) Mr. Greenbaum objected to the contents of the March 25 Letter, but he indicated that Urban was amenable to negotiating a compromise and asked Ms. Holtz for information about the appraisals that Plaintiffs had secured. (*Id.* at 5.)

On April 7, 2020, less than halfway through the thirty-day period established by the March 25 Letter, Plaintiffs filed a two-count complaint in this Court (the "Ohio Complaint"). (ECF No. 1.) In Count I, Plaintiffs seek a declaratory judgment that "Urban had repudiated, renounced, and waived" its purchase rights; that Urban must offer the Properties for Sale; and that SCDC may market and obtain offers to purchase the Properties. (*Id.* at 10–11.) In Count II, Plaintiffs allege that Urban has breached the Agreements by purportedly refusing to offer the Properties for sale. (*Id.* at 11–12.)

On April 9, 2020, Urban filed a lawsuit against Nationwide, SCDC, and Wentwood in the Northern District of Illinois (the "Illinois Complaint"). (ECF No. 6-3.) Count I of the Illinois Complaint alleges that Nationwide and SCDC breached the Agreements and violated the duty of

good faith and fair dealing. (*Urban 2004 Holding Co. v. Nationwide Affordable Hous. 27, LLC*, 1:20-cv-2243, ECF No. 1, at 23–24 (N.D. Ill. Apr. 9, 2020).) Count II seeks a declaratory judgment that Urban is entitled to exercise its purchase option rights and that SCDC has no right to force the sale of the Properties. (*Id.* at 24–26.) Count III alleges that Wentwood tortiously interfered with the Agreements. (*Id.* at 26–27.)

## II. STANDARD OF REVIEW

Where "actions involving nearly identical parties and issues have been filed in two different district courts, 'the court in which the first suit was filed should generally proceed to judgment.'" *Zide Sport Shop of Ohio, Inc. v. Ed Tobergte Assocs.*, 16 F. App'x 433, 437 (6th Cir. 2001) (quoting *In re Burley*, 738 F.2d 981, 988 (9th Cir. 1984)). However, this first-to-file rule is subordinate to principles of equity and may not be appropriate in cases involving bad faith, an anticipatory suit, forum shopping, or other inequitable conduct. *See id.*

The first-to-file rule is particularly anemic where the first-filed lawsuit is a declaratory judgment action. *See Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 551–52 (6th Cir. 2007). A first-filed declaratory judgment action should ordinarily give way to a later-filed substantive suit unless "some additional harm, not merely waiting for the natural plaintiff to sue, will befall the declaratory plaintiff in the meantime." *AmSouth Bank v. Dale*, 386 F.3d 763, 786 (6th Cir. 2004). This is part and parcel with a district court's discretion not to hear a declaratory judgment action, even where it has jurisdiction. *Id.* at 784.

In determining whether to exercise jurisdiction over a declaratory judgment action, a court considers five factors: "(1) whether the judgment would settle the controversy; (2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue; (3) whether the declaratory remedy is being used merely for the purpose of 'procedural

fencing' or 'to provide an arena for a race for res judicata'; (4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and (5) whether there is an alternative remedy that is better or more effective." *Zide*, 16 F. App'x at 437–38 (quoting *Scottsdale Ins. Co. v. Roumph*, 211 F.3d 964, 968 (6th Cir. 2000)). These are known as the *Grand Trunk* factors. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 563 (6th Cir. 2008).

## III. ANALYSIS

The Court begins with Plaintiffs' argument that the Ohio Complaint is a "substantive action" because of Count II, the breach of contract claim, and then moves on to analyzing the *Grand Trunk* factors.

### 1. The Character of the Ohio Complaint

Plaintiffs resist the idea that the Ohio Complaint can be characterized as a "declaratory judgment action" (and thus that this Court can decline to exercise jurisdiction) because of the presence of Count II, nominally a breach of contract claim. However, a cursory review of Section 6.5H shows that beneath the contractual veneer of Count II hides a disguised version of Count I's declaratory judgment claim.

Pursuant to Section 6.5H, Urban has an initial, unfettered right to purchase a greater share in the Partnerships, assuming it complies with the relevant provisions of the Agreements. This right was not exercisable until after the close of the Compliance Period on December 31, 2019. But the Agreements are clear that after the Compliance Period closed, Urban had nine months to exercise its rights. Plaintiffs impliedly concede this by arguing that Urban has waived its purchase rights because no waiver would be necessary if the window in which Urban could exercise its purchase rights had already closed.

SCDC's rights to force the sale of the Properties is contingent on Urban not exercising its purchase rights during this nine-month period. In fact, Section 6.5H explicitly states that SCDC may exercise its sales rights "at any time after the expiration of the said nine (9) month period" if Urban fails to exercise its purchase rights in accordance with Section 6.5H. That phrasing necessarily means that SCDC has no right to force the sale of the Properties until after the close of the nine-month period—a period that remains ongoing for another three months—unless the Agreements or some principle of law allows for an acceleration of this timeline.

In support of their efforts to bring this lawsuit before this nine-month period has run, Plaintiffs repeatedly insist that Urban's "refusal to have a mutually-agreeable appraisal performed constitutes an express renunciation, repudiation, and waiver" of its purchase rights. (Compl. ¶¶ 8, 9, 11, 43–45, 52, 56–58, 60; ECF No. 7, at 4; *see also* ECF No. 1-5, at 2 ("Urban's unequivocal rejection of its option to purchase . . . triggers the . . . right to require that Urban offer the properties for sale.").) As far as the Court can tell, Plaintiffs invent this idea of "renunciation, repudiation, and waiver" out of whole cloth. Not once in their invocation of this theory do Plaintiffs point to where in the Agreements they have derived the idea that Urban's purchase rights are renounceable, repudiable, or waivable.

Rather, the Agreements appear to say the opposite. They say that SCDC's right to force a sale of the Properties does not begin until the close of the nine-month period, meaning that SCDC's right to force a sale did not yet exist at the time the Ohio Complaint was filed and will not exist for a few months yet, if ever. In the same vein, Urban's right to purchase appears to remain intact.

For purposes of this opinion, the Court assumes, as Plaintiffs allege, that Urban has not arranged a "mutually agreeable appraisal" as required by Section 6.5H and that Urban has

6

"refused" to arrange such an appraisal. Even so, Plaintiffs have not identified a portion of the Agreements that would bar Urban from changing its mind. That is, it seems likely that Plaintiffs still have three months to secure a mutually agreeable appraisal and to exercise their purchase rights. And until this nine-month period comes to a close without the exercise of those purchase rights, SCDC's right to force a sale lies dormant. That is not to say that Urban's right to purchase cannot be prematurely extinguished or that SCDC's right to force a sale cannot be accelerated. The Court must conclude, however, that Plaintiffs offer nothing to indicate that they can be.

The upshot of all of this is that Count II of the Complaint appears to be manufactured. It alleges a legal impossibility, the breach of a contractual provision that is not yet exercisable. If the right to sale provision has not yet been triggered, it is not possible for Urban to have breached it. Moreover, a finding of a breach as alleged in Count II necessarily would mean that Urban's purchase rights have lapsed, which would effectively be a declaratory finding in Plaintiffs' favor on Count I.

Count II appears to be a declaratory judgment claim dressed in coercive claim clothing, and Plaintiffs have not offered anything to indicate otherwise. Accordingly, the Court concludes that the Ohio Complaint is a declaratory judgment action regardless of the existence of Count II.

### 2. The *Grand Trunk Factors*

Because this is a declaratory judgment action, the Court must decide whether exercising its jurisdiction in this matter is prudent. This is where the *Grand Trunk* factors come into play, and the Court will analyze each in turn.

#### a. Whether a judgment would settle the controversy

A judgment here would not settle the controversy because of the outstanding claims in the Illinois Complaint that are not part of the litigation in this Court. Urban has sued Plaintiffs for

breach of contract and a violation of the duty of good faith and fair dealing, and Urban has also sued Wentworth for tortious interference with the Agreements. Even assuming that Urban could bring counterclaims against Plaintiffs in order to resolve the former, it is unlikely that the latter could be resolved in this case. This is so because there is reason to doubt whether Wentworth is subject to personal jurisdiction in this district. (*See Nationwide Affordable Hous. Fund 4, LLC v. Urban 8 Danville Corp.*, 2:19-cv-1848, ECF No. 23, at 10 (S.D. Ohio Nov. 7, 2019).) On the flip side, the gravamen of the Ohio Complaint has already been asserted in the Illinois Complaint and can be litigated in the Northern District of Illinois. This first factor weighs in favor of declining jurisdiction.

### b. Whether this declaratory judgment action serves a "useful purpose"

A declaratory judgment action serves a "useful purpose" if it seeks to clarify future legal duties rather than redress past harms." *AmSouth Bank*, 386 F.3d at 786. That is categorically not the case here. Plaintiffs seek to vindicate a perceived wrong. They believe that Urban is obligated to assist in the sale of the Properties, and Plaintiffs seek to force them to do so. In other words, they seek to redress the alleged past harm of Urban's purported refusal.

"This is not a situation in which a declaratory plaintiff will suffer injury unless legal relations are clarified; the [plaintiffs] do not currently act at their peril." *Id.* at 786 (internal quotation marks omitted). As discussed above, it is doubtful that SCDC's right to force the sale has been triggered yet, so there is no current or even impending harm. So, for example, "a party with an ongoing contractual relationship who has been accused of breach can go to court and have the contract definitively interpreted . . . ." *Id.* But that party who has allegedly breached the contract is Urban, not Nationwide or SCDC. It is Urban that is currently acting at its peril, not Plaintiffs.

8

### c. Whether the declaratory judgment claim is mere procedural fencing

The facts plainly demonstrate Plaintiffs' rush to push this case towards litigation. And the parallels between this case and two cases in which the Sixth Circuit found that such procedural fencing had occurred are stark.

In *Zide*, the plaintiffs and one of the defendants entered into settlement discussions in the midst of a trademark dispute. 16 F. App'x at 435. After settlement talks broke down, the defendant sent a letter to the plaintiff saying it would file suit if it did not get a settlement offer within one week. *Id.* The plaintiff requested an extension of time to respond, which the defendant granted. *Id.* The day before that extension was to expire, the plaintiff filed a lawsuit seeking trademark cancellation and declaratory relief. *Id.*

In *AmSouth Bank*, the defendants were investigating the plaintiff banks, AmSouth Bank ("AmSouth") and First Tennessee Bank ("FTB"), who the defendants believed were complicit in an embezzlement scheme. 386 F.3d at 770–71. AmSouth and the defendants engaged in settlement discussions, and they entered into a tolling agreement that was continuously extended as the discussions continued. *Id.* One month before the final tolling agreement was set to expire, the defendants provided AmSouth with a draft complaint and notified the bank of their intent to file it if their latest settlement offer were not accepted by a particular date. *Id.* at 771. On the day the offer was set to expire, AmSouth requested an extension of time to respond and was granted nine additional days. *Id.* Two days before the offer was again set to expire, AmSouth notified the defendants that it was still considering the settlement demand. *Id.* The following day, one day before the deadline, AmSouth filed a declaratory judgment action. *Id.*

FTB acted similarly. It asked for a formal settlement demand after signing a tolling agreement and engaging in preliminary settlement negotiations. *Id.* at 787. But FTB did not even wait for the preparation of this settlement demand before filing suit. *Id.*

In both cases, the Sixth Circuit determined that the plaintiffs had acted in bad faith and that an exercise of the district court's jurisdiction was unwarranted. *Id.* at 785; *Zide*, 16 F. App'x at 438. "Courts take a dim view of declaratory plaintiffs who file their suits mere days or weeks before the coercive suits filed by a 'natural plaintiff' and who seem to have done so for the purpose of acquiring a favorable forum." *AmSouth Bank*, 386 F.3d at 788.

In both of these cases, and the case at bar, the plaintiffs created arbitrary deadlines that they then used to stave off their litigation opponents long enough to file suit. As with the plaintiffs in *Zide* and *AmSouth Bank*, Plaintiffs lulled Urban into thinking that it intended to continue to engage in settlement discussions by a setting a particular response deadline and then purposefully filing its lawsuit before that deadline lapsed in order to win the race to the courthouse. This lulling is evidence of bad faith. *See id.* at 787 ("This is . . . the case of the defendant who races to the courthouse while at the same time assuring the plaintiff that the defendant is still interested in at least discussing settlement options."); *Zide*, 16 F. App'x at 438. Baiting the other side into continuing settlement negotiations is clear evidence that a declaratory action is filed "not to resolve issues of liability that were hindering . . . normal behavior, but instead to gain procedural advantage." *AmSouth Bank*, 386 F.3d at 789–90.

Plaintiffs try to avoid this conclusion by arguing that they have been harmed by Urban's alleged refusal to offer the Properties for sale and by arguing that they filed this lawsuit immediately after learning of Urban's alleged refusal. (ECF No. 7, at 8–10.) This rings hollow. If Plaintiffs' conduct was not "mere deceptive gamesmanship," *see Zide*, 16 F. App'x at 438

10

(internal quotation marks omitted), then they would not have asked Urban for a response within thirty days when they intended to file the Ohio Complaint weeks before that deadline expired.

Plaintiffs also argue that they did not act in bad faith because they "did nothing to mislead Urban into believing they would be content to continue negotiating rather than filing suit." (ECF No. 7, at 13.) The Court disagrees. The response deadline in Plaintiffs' March 25 Letter is itself evidence of bad faith. *See Internet Transaction Sols., Inc. v. Intel Corp.*, No. 2:06-CV-035, 2006 WL 1281654, at *7 (S.D. Ohio May 8, 2006) ("When a declaratory judgment action is filed within the response period provided in a recent cease-and-desist letter, it may be found that the plaintiff acted in bad faith." (internal quotation marks omitted)). It would be naïve to think that Plaintiffs' decision to file the Ohio Complaint weeks before their chosen response deadline was unintentional. "Judges are not required to exhibit a naivete from which ordinary citizens are free." *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977).

Regardless, the bad faith inquiry is more expansive than Plaintiffs' narrow framing. It "also encompasses 'whether the suit preemptively foreclosed settlement opportunities.'" *Internet Transaction Sols.*, 2006 WL 1281654, at *7 (quoting *IMS Health, Inc. v. Vality Tech., Inc.*, 59 F. Supp. 2d 454, 463 (E.D. Pa. 1999)). Plaintiffs' filing of the Ohio Complaint did just that. The Ohio Complaint was filed after three months of settlement conversations, conversations that appeared to remain ongoing. *See Catholic Health Partners v. CareLogistics, LLC*, 973 F. Supp. 2d 787, 795 (N.D. Ohio 2013) ("A court should view the issue of whether a first-filing plaintiff lulled its opponent into staying his hand from the perspective of the opponent, not the first-filer.").

Plaintiffs even acknowledge that Mr. Greenbaum stated during the March 31 phone call that Urban was amenable to a compromise. A reasonable party in Urban's position would have

11

thought that settlement discussions remained ongoing and that litigation was not yet necessary. *See id.* While the plaintiffs in some of the case law "may have acted more egregiously" in misleading their negotiating partners than did Plaintiffs, that "does not absolve" Plaintiffs "if they indicated, as they did, that settlement was under consideration." *Id.*

### d. Whether there is an alternative remedy

The final relevant factor is the fifth one.[1] There is an alternative remedy in this matter, and that exists in the form of the Illinois Complaint. *See AmSouth Bank*, 386 F.3d at 791 ("The existence of a coercive action is important to our determination that this declaratory action would serve no useful purpose."). All relevant grievances are resolvable as a part of that action.

### e. Conclusion

The four relevant factors all weigh heavily in favor of not exercising jurisdiction in this case. Agreeing to exercise jurisdiction would incentivize shotgun litigation designed to short-circuit the settlement process. *See Internet Transaction Sols.*, 2006 WL 1281654, at *7. It is prudent for the Court to decline to exercise jurisdiction given substantial evidence of Plaintiffs' bad faith efforts to win a race to the courthouse. Their arguments in defense of their actions are unavailing.

Plaintiffs make one final point worth addressing. They go to great lengths to emphasize that venue is proper in the Southern District of Ohio and that Plaintiffs have a right to assert a cause of action in their home district. (ECF No. 7, at 1, 8, 11–12.) The Court does not disagree. But Plaintiffs do not have the right to gin up a case or controversy in an effort to steer litigation to their preferred venue. The fact that venue might be proper in this district is irrelevant. *Cooper & Elliot v. Estate of Popovich*, No. 2:14-cv-505, 2015 WL 3795850, at *3–4 (S.D. Ohio June 18,

---

[1] The parties agree that the fourth factor is not at issue here, since there is no relevant litigation pending in state court. (ECF No. 6, at 15 n.10; ECF No. 7, at 10 n.5.)

12

2015); *Catholic Health*, 973 F. Supp. 2d at 795. "The appropriate question is not whether a party has chosen a better forum but rather whether the declaratory plaintiff filed first to choose the forum." *Catholic Health*, 973 F. Supp. 2d at 795. That is exactly what Plaintiffs did here.

## IV.    CONCLUSION

The Court declines to exercise jurisdiction over this declaratory judgment action. Urban's Motion to Dismiss is **GRANTED**.

**IT IS SO ORDERED**.

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**